UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
INTESA SANPAOLO S.p.A.,

                                    Plaintiff,                          08 Cv. 2223 (LLS)

                    -against-

 ROBERT D. PILIERO, EDWARD J. GOLDSTEIN,
and JOHN DERMOTT MITCHELL,

                                    Defendants.
-----------------------------------------------------------------------X
ROBERT D. PILIERO and EDWARD J. GOLDSTEIN,

                                    Third-Party Plaintiffs,

                    -against-                                **NOTICE OF MOTION**

NEW MILLENINIUM ESTATES LTD, COLLIERS ABR,
INC., RICHARD MICHAELS and JAMES FREDERICK,

                                    Third-Party Defendants.
-----------------------------------------------------------------------X

    **PLEASE TAKE NOTICE** that, upon the annexed declaration of Peter T. Shapiro, Esq.,

dated June 9, 2008, the exhibits annexed thereto, and the accompanying Memorandum of Law,

Third-Party Defendants Colliers ABR, Inc., James Frederick and Richard Michaels, by their

undersigned attorneys, will move this Court,  at the Daniel P. Moynihan United States

Courthouse, 500 Pearl Street, New York, New York, before the Honorable Louis L. Stanton, on

a date to be set by the Court, for an Order: (a) pursuant to Rule 12(b)(6) of the Federal Rules of

Civil Procedure, dismissing the Third-Party Complaint and the Cross-claim of defendant John

Dermot Mitchell, in their entirety, with prejudice, for failure to state a claim upon which relief

can be granted; (b)  pursuant to Rule 26 of the Federal Rules of Civil Procedure granting a stay

of discovery pending the adjudication of this motion; and (c) granting such other and further

relief as the Court may deem just and proper.

Dated: New York, New York
       June 9, 2008

**LEWIS BRISBOIS BISGAARD & SMITH LLP**
Attorneys for Third-Party Defendants Colliers ABR, Inc., James
Frederick and Richard Michaels

By: _____
    Peter T. Shapiro (PS 9692)
    199 Water Street
    New York, New York 10038
    212-232-1300

To: Michael C. Lambert, Esq.
    Gilmartin, Poster & Shafto
    *Attorneys for Plaintiff Intesa Sanpaolo S.p.A.*
    845 Third Avenue
    New York, NY 10022
    Tel (212) 425-3220
    Fax (212) 425.3130

    Craig A. Newman
    Richards Kibbe & Orbe LLP
    *Attorneys for Defendants Robert D. Piliero*
    *and Edward J. Goldstein*
    One World Financial Center
    New York, New York 10281-1003
    Tel (212) 530-1800
    Fax (212) 530-1800

    Richard B. Salomon, Esq.
    Wolf Block Schorr and Solis-Cohen LLP
    *Attorneys for Third-Party Defendant New Millennium*
    250 Park Avenue
    New York, New York 10177
    Tel (212) 986-1116
    Fax (212) 986-0604

    Cathy Fleming, Esq.
    Nixon Peabody, LLP
    *Attorneys for Defendant John Dermott Mitchell*
    437 Madison Avenue

4819-3153-7154.1

New York, New York 10022
Tel (212) 940-3000
Fax (212) 940-3111

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
INTESA SANPAOLO S.p.A.,

                                                    08 Cv. 2223 (LLS)

                              Plaintiff,

          -against-

ROBERT D. PILIERO, EDWARD J. GOLDSTEIN,
and JOHN DERMOTT MITCHELL,

                              Defendants.
-------------------------------------------------------------------------X
ROBERT D. PILIERO and EDWARD J. GOLDSTEIN,

                    Third-Party Plaintiffs,

          -against-                              **DECLARATION**

NEW MILLENINIUM ESTATES LTD, COLLIERS ABR,
RICHARD MICHAELS and JAMES FREDERICK,

                    Third-Party Defendants.
-------------------------------------------------------------------------X

     **PETER T. SHAPIRO**, an attorney duly admitted to practice before this Court, declares

as follows under the penalties of perjury:

     1.     I am a partner of Lewis Brisbois Bisgaard & Smith LLP, attorneys for third-party

defendants Colliers ABR, Inc., James Frederick and Richard Michaels. I submit this declaration

in support of those parties' motion for an order pursuant to Rule 12(b)(6), F. R. Civ. P., to

dismiss the Third-Party Complaint and the Cross-claim of defendant Mitchell for failure to state

a claim.

     2.     Annexed hereto as Exhibit A is a copy of the Third-Party Complaint, which is

part of the answer of defendants Piliero and Goldstein to Plaintiff's Complaint.

4819-3153-7154.1

3.    Annexed hereto as Exhibit B is a copy of Plaintiff's Complaint.

4.    Annexed hereto as Exhibit C is a copy of the Answer of defendant Mitchell, which includes a Cross-claim against movants.

5.    For the reasons set forth in the accompanying memorandum of law, it is respectfully submitted that the Third-Party Complaint and the Cross-claim should be dismissed for failure to state a claim, and that the Court should grant such other and further relief as is just and proper

Dated: New York, New York
       June 9, 2008

Peter T. Shapiro (PS 9692)

*CERTIFICATE OF SERVICE*

Peter T. Shapiro, an attorney duly admitted to practice before this court, certifies that on June 9, 2008 he caused to be served via ECF and first-class mail the Notice of Motion and declaration of Peter T. Shapiro upon the attorneys of record for the plaintiff, defendants and third party defendant.

PETER T. SHAPIRO (PS 9692)

**EXHIBIT A**

Craig A. Newman
Richards Kibbe & Orbe LLP
One World Financial Center
New York, New York 10281
Telephone: (212) 530-1924
Facsimile: (212) 530-8924

Attorneys for Defendants Robert D. Piliero and Edward J. Goldstein

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

INTESA SANPAOLO S.p.A.,

                  Plaintiff,

       -against-

ROBERT D. PILIERO, EDWARD J. GOLDSTEIN,
and JOHN DERMOTT MITCHELL,

                  Defendants.

------------------------------------------------------------x

ROBERT D. PILIERO and EDWARD J. GOLDSTEIN,

           Third-Party Plaintiffs,

       -against-

NEW MILLENNIUM ESTATES LTD, COLLIERS ABR,
RICHARD MICHAELS and JAMES FREDERICK,

          Third-Party Defendants.

------------------------------------------------------------x

08 Cv. 2223 (LLS) (ECF)

**ANSWER AND THIRD PARTY
COMPLAINT WITH JURY
DEMAND OF ROBERT D.
PILIERO AND EDWARD J.
<u>GOLDSTEIN</u>**

Defendants and Third-Party Plaintiffs Robert D. Piliero ("Piliero") and Edward J. Goldstein ("Goldstein") (collectively, "Guarantors"), through their attorneys Richards Kibbe & Orbe LLP, hereby assert as their Answer to the Complaint of plaintiff Intesa Sanpaolo S.p.A. ("Plaintiff" or "Intesa"), and as their Third-Party claims against Third-Party Defendants New

Millennium Estates LTD ("New Millennium"), Colliers ABR ("Colliers"), Richard Michaels ("Michaels") and James Frederick ("Frederick") as follows:

1.   Deny knowledge or information sufficient to form a belief with respect to the allegations set forth in Paragraph 1 of the Complaint.

2.   Deny knowledge or information sufficient to form a belief with respect to the allegations set forth in Paragraph 2 of the Complaint.

3.   Deny the allegations set forth in Paragraph 3 of the Complaint, except admit that Piliero was at all relevant times a citizen and resident of the State of New York; admit that Goldstein is now a citizen and resident of the State of New York; and deny knowledge or information sufficient to form a belief with the respect to the citizenship and residence of defendant John Dermott Mitchell ("Mitchell").

4.   Deny the allegations set forth in Paragraph 4 of the Complaint on the ground that they call for legal conclusions as to which no response is required.

5.   Deny the allegation set forth in Paragraph 5 of the Complaint on the ground that it calls for a legal conclusion as to which no response is required.

6.   Deny knowledge or information sufficient to form a belief with respect to the allegations set forth in Paragraph 6 of the Complaint.

7.   Admit the allegations set forth in Paragraph 7 of the Complaint, except deny the knowledge or information sufficient to form a belief as to whether Intesa is the successor-in-interest to Cariplo-Cassa di Risparmio Delle Provincie Lombarde S.p.A.

8.   Deny the allegations set forth in Paragraph 8 of the Complaint, and refer to the sublease documents for a complete and accurate statement of their terms.

- 2 -

9.    Deny the allegations set forth in Paragraph 9 of the Complaint, except: admit that Piliero and Goldstein were partners in a limited liability partnership named Piliero Goldstein Kaiser and Mitchell, LLP ("PGKM"); admit that they signed an Agreement and Guarantee dated March 20, 2003 (the "Guarantee"), a true copy of which is annexed hereto as Exhibit 1, and refer to that document for a complete and accurate statement of its terms; and affirmatively allege that the Guarantee was a so-called "Good Guy" Guarantee pursuant to which Intesa had specifically agreed, in the paragraph labeled "Fourth," that "the obligations of the Guarantors will end after [Intesa] receives vacant possession of the Demised Premises in the condition they are required to be surrendered under the Sublease; and" PGKM's right to possession of the premises "has terminated and cannot be revived"; and further affirmatively allege that the Guarantee also specifically provided, in the paragraph labeled "Fifth," that the Guarantors' obligation under the Guarantee would be "reduced to zero" as of March 19, 2006 as long as PGKM paid and performed all its obligations under the Sublease through that date and as long as the conditions of the paragraph labeled "Fourth" were satisfied; and further affirmatively alleges that the conditions precedent to full exoneration and release of the Guarantors under the terms of the Guarantee have occurred.

10.    Deny the allegations set forth in Paragraph 10 of the Complaint, and refer to the documents to which reference is made for a complete and accurate statement of their terms.

11.    Deny the allegations set forth in Paragraph 11 of the Complaint, and affirmatively allege that all amounts owed to Intesa were paid to it in full on or before November 30, 2007.

12.    Deny the allegations set forth in Paragraph 12 of the Complaint, except admit that the subject premises were vacated on or before November 30, 2007, and affirmatively allege that

- 3 -

the condition of the subject premises was in material compliance with the relevant provisions of all these documents.

13.    Deny the allegations set forth in Paragraph 13 of the Complaint.

14.    Deny the allegations set forth in Paragraph 14 of the Complaint, except admit that Intesa re-let the premises effective January 1, 2008, only one month after said premises were vacated.

15.    Deny the allegations set forth in Paragraph 15 of the Complaint, and affirmatively allege the following:

(a)  as of November 30, 2007, the total amount then claimed by Intesa to be due with respect to the subject premises was $133,576.15;

(b)  by letter dated November 20, 2007, a true copy of which is annexed hereto as Exhibit 2, PGKM advised counsel for Intesa that: (i) PGKM intended to vacate the subject premises on or before November 30, 2007; (ii) PGKM understood that the total amount claimed by Intesa to be due from PGKM under the sublease was for the months of October and November 2007, in the aggregate amount of $133,576.15; and (iii) PGKM intended to pay that amount in full on or before November 30, 2007 by providing Intesa with a check in the amount of $13,858.15 and written authorization for Intesa to draw down on the $119,718 letter of credit that had been posted as collateral security under the Sublease;

(c)  Intesa did not advise PGKM of any dispute with respect to the amount owed (in fact, the amount was the same amount as reflected in Intesa's outstanding invoices), nor did it advise PGKM that it intended to allocate the payments to be made by PGKM in any manner different from that specified in PGKM's November 20, 2007 letter;

- 4 -

(d) by letter dated November 30, 2007, a true copy of which is annexed hereto as Exhibit 3, and delivered by hand to Intesa's counsel that same day, PGKM did in fact authorize Intesa to draw down on the letter of credit in the amount of $119,718, and did in fact enclose a check in the amount of $13,858.15, which together aggregated $133,576.15 for the months of October and November 2007, which was the total amount that was then claimed by Intesa to be due from PGKM with respect to the subject premises;

(e) on or before November 30, 2007, PGKM delivered vacant possession of the premises to Intesa in the condition required under the Sublease;

(f) almost immediately after receiving PGKM's written authorization, Intesa did in fact draw down on the letter of credit in the amount of $119,718 by falsely representing to the issuing bank that that sum was in fact due and owing.

16.    Deny the allegations set forth in Paragraph 16 of the Complaint.

17.    Deny the allegations set forth in Paragraph 17 of the Complaint and refer to the Guarantee for a complete and accurate statement of its terms.

18.    Deny the allegations set forth in Paragraph 18 of the Complaint, and refer to the Guarantee for a complete and accurate statement of its terms.

19.    Deny the allegations set forth in Paragraph 19 of the Complaint, and refer to the Guarantee for a complete and accurate statement of its terms.

20.    Deny the allegations set forth in Paragraph 20 of the Complaint, except admit that Intesa, through its counsel, has made repeated demands on Defendants Piliero and Goldstein for the payment of amounts to which Intesa has no entitlement, and that Defendants Piliero and Goldstein have refused to pay such amounts.

21.　Deny the allegations set forth in Paragraph 21 of the Complaint, and affirmatively allege that the conduct of Intesa in the months preceding PGKM's vacating of the premises constituted multiple breaches of the covenant of good faith and fair dealing that is legally implied into the contracts between Intesa and defendants Piliero and Goldstein under the terms of the Guarantee.

22.　Deny the allegations set forth in Paragraph 22 of the Complaint.

### FIRST DEFENSE

23.　The Complaint and each and every claim thereof fails to state a claim upon which relief may be granted against Piliero and Goldstein.

### SECOND DEFENSE

24.　Piliero and Goldstein have no liability under the Guarantee.

### THIRD DEFENSE

25.　Intesa has received all amounts to which it is entitled under the Guarantee.

### FOURTH DEFENSE

26.　As a result of the acts, conduct, and omissions of Plaintiff, its agents, and Third-Party Defendants, each and every claim and cause of action presented in the Complaint has been waived.

### FIFTH DEFENSE

27.　As a result of the acts, conduct and omission of Plaintiffs, its agents, and Third-Party Defendants, each and every claim and cause of action presented in the Complaint is barred by the doctrine of estoppel.

## SIXTH DEFENSE

28.    Plaintiff is barred from recovering on each and every claim and cause of action presented in the Complaint by the doctrine of unclean hands.

## SEVENTH DEFENSE

29.    Each and every claim and cause of action of Plaintiff is barred on the grounds that Plaintiff has failed to join one or more indispensable parties.

## EIGHTH DEFENSE

30.    Each and every claim and cause of action of Plaintiff is barred in whole or in part because any harm or damage(s) alleged is not legally attributable to the acts or omissions of Piliero or Goldstein.

## NINTH DEFENSE

31.    Each and every claim and cause of action of Plaintiff is barred in whole or in part because Plaintiff's alleged losses, if any, were caused by Plaintiff's own conduct (or conduct of Plaintiff's agents) and/or misconduct, and/or the supervening and intervening actions of third parties.

## TENTH DEFENSE

32.    Each and every claim and cause of action of Plaintiff is barred in whole or in part by the doctrine of in pari delicto

## ELEVENTH DEFENSE

33.    INTESA is estopped from asserting the claim set forth in the Complaint as a result of its conduct, both before and after the premises were vacated, including without limitation the following:

(a)    In July 2007, Intesa specifically agreed in writing to permit PGKM to enter into a Further Sublease Agreement with a third party, and also agreed that upon such re-letting, PGKM would have no further responsibility for the payment of rent under the Sublease.

(b)    In reliance on Intesa's written agreement as set forth above, PGKM identified and then negotiated with the law firm McKee Nelson, LLP with respect to a Further Sublease Agreement pursuant to which McKee Nelson would take over all the responsibilities of PGKM under the Sublease.

(c)    At about the same time, Intesa advised PGKM that it would much prefer it if the Prime Landlord, New Millennium, would enter into a direct lease with McKee Nelson so that both Intesa and PGKM would be relieved of any further responsibility with respect to the subject premises. To that end, New Millennium requested and received financial information from McKee Nelson to satisfy themselves as to McKee Nelson's creditworthiness.

(d)    After their review of that financial information, representatives of both New Millennium and Intesa represented and confirmed to PGKM that a direct leasing relationship would be entered into between New Millennium and McKee Nelson, thereby making it unnecessary and inappropriate for PGKM to submit an executed Further Sublease Agreement between PGKM and McKee Nelson.

(e)    Contrary to the representations made to PGKM, Intesa and New Millennium thereafter took no steps to ensure that New Millennium followed through on its commitment to enter into a direct lease arrangement with McKee Nelson. But neither did Intesa at any time advise PGKM that the direct lease arrangement between New

- 8 -

Millennium and McKee Nelson would not be consummated and that PGKM should revive the originally contemplated Further Sublease Agreement between PGKM and McKee Nelson, and submit an executed Further Sublease Agreement to Intesa.

(f)    In September 2007, McKee Nelson notified PGKM, and PGKM promptly notified both Intesa and New Millennium, that the dealy and inaction on the part of New Millennium and Intesa to consummate the transactions pursuant to which McKee Nelson would become a direct tenant of New Millennium had left McKee Nelson with no alternative except to pursue other real estate opportunities.

(g)    By e-mail dated October 16, 2007, after having learned of the events that had transpired in the months preceding his direct involvement, Intesa's attorney agreed that PGKM had acted diligently and responsibly, and that the problem arose because New Millennium's agent, Colliers, had "preferred to forward their interest."    Intesa's attorney also noted that Colliers' conduct "cost [Intesa] a lot of money," but that he has "a very long memory."

(h)    After the McKee Nelson deal fell apart as a result of the delay and inaction of New Millennium and Intesa, and despite his "long memory," counsel for Intesa advised PGKM that Intesa would not even consider discussing a termination date for the Sublease until after PGKM physically vacated the premises. This was in direct contradiction to Intesa parties' position, notwithstanding the fact that PGKM had months earlier advised both Intesa and New Millennium of its intention, and its willingness, to vacate the subject premises on any date and on any notice, however short, that would enable Intesa and New Millennium to keep the subject premises occupied without any

- 9 -

interruption in rental payments. PGKM promptly notified counsel for Intesa that it would vacate the premises on or before November 30, 2007.

(i)    On November 20, 2007, PGKM advised Intesa, through its counsel, that on November 30, 2007, PGKM would vacate the premises and pay the entire outstanding balance of $133,576.15, through a combination of a check and authorization to draw down on the letter of credit that had been posted as collateral security under the Sublease.

(j)    At no time thereafter did Intesa advise PGKM of any disagreement with respect to the amount owed or of any intention to apply the amounts paid to it in any manner other than are set forth in the PGKM's letter of instruction

(k)    On or about November 30, 2007, PGKM did in fact pay Intesa the sum of $133,576.15, and PGKM did in fact vacate the premises and turn them over to Intesa in the manner required by the Sublease.

(l)    By drawing down on the letter of credit in the amount of $119,718 on or about December 5, 2007, Intesa acknowledged that it did in fact apply the payments tendered by PGKM on November 30, 2007 in the manner instructed by PGKM.

## THIRD-PARTY COMPLAINT

1.    Third-Party Plaintiffs Robert D. Piliero and Edward J. Goldstein ("Guarantors") are Guarantors under an Agreement and Guarantee dated on or about March 20, 2003 (the "Guarantee") pursuant to which they, as well as others, guaranteed certain obligations of Piliero Goldstein Kaiser and Mitchell, LLP ("PGKM") with respect to a certain Sublease Agreement entered into on or about March 20, 2003 between PGKM and Banca Intesa S.p.A., a predecessor-

- 10 -

in-interest to the plaintiff in this action, Intesa Sanpaolo S.p.A. ("Intesa").  A true copy of the Guarantee is annexed hereto as Exhibit 1.

2.      Third-Party Defendant New Millennium Estates LTD ("New Millennium") is the prime landlord of the subject premises, and a party to a lease dated on or about January 4, 1994 with a predecessor-in-interest to Intesa.

3.      Third-Party Defendant Colliers ABR ("Colliers") is the exclusive agent of New Millennium with respect to the subject premises.

4.      Third-Party Defendant Richard Michaels ("Michaels") is a Managing Director of Colliers with direct responsibility for the representation of New Millennium with respect to the subject premises.

5.      Third-Party Defendant James Frederick ("Frederick") is a principal and a Managing Director of Colliers, with direct responsibility for the representation of New Millennium with respect to the subject premises.  Frederick is Michaels' immediate superior. Upon information and belief, Frederick authorized, approved and/or was timely informed about all of Michaels' unlawful conduct described below.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction of the third-party claims pursuant to 28 U.S.C. § 1367.

7.      All third-part defendants are subject to personal jurisdiction in this judicial District.  Third-party defendant New Millennium owns and operates real estate located at 10 East 53rd Street, the building in which the subject premises is located.  Third-party defendants Colliers, Michaels and Frederick maintain offices in this District, located at 40 East 52nd Street, New York, New York, and continuously and systematically conduct business in this District.

- 11 -

8.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a).

## NATURE OF THE ACTION

9.    Under the terms of the Guaranty between Guarantors and Intesa, the obligations of the Guarantors ended on November 30, 2007 because, among other things, on that date Intesa received vacant possession of the subject premises in the condition they were required to be surrendered under the Sublease; PGKM's right to possession of the premises had terminated and could not be revived; and PGKM had paid and performed all its obligations under the Sublease through that date. In addition to that, pursuant to the Guaranty, the Guarantors' obligation under the Guarantee had been "reduced to zero" as of March 19, 2006. As a result, pursuant to the express terms of the Guaranty, the Guarantors have no liability for any period of time after PGKM vacated the premises on November 30, 2007.

10.    Notwithstanding these facts and the terms of the Guaranty, Intesa has asserted a claim in this action against Piliero and Goldstein in their capacities as Guarantors under the Guaranty identified above. Insofar as relevant to this action, Intesa alleges that it lost rent for December 2007, the only month during which the premises were vacant, and paid a brokerage commission to secure a new tenant for the subject premises after PGKM vacated and irrevocably surrendered possession of the premises. In the event Guarantors are found liable to Intesa notwithstanding the foregoing, the third-party defendants should be held liable, jointly and severally, for any and all amounts that Guarantors may be found liable to pay to Intesa for the reasons set forth below.

11.    On or about June 2007, Piliero advised Michaels in a telephone call that, as a result of certain events at PGKM, it would be necessary for PGKM to vacate the premises; that PGKM was considering the engagement of a real estate broker to locate an entity to enter into a

further sublease with PGKM with respect to the subject premises; but that the prime landlord, New Millennium, might wish simply to recapture the premises because Michaels had earlier advised Piliero that the then-current market rent for the premises was approximately $80 per square foot, and PGKM was then only paying about $45 per square foot. Michaels indicated that he needed to speak with Frederick about this.

12.    Shortly thereafter, Michaels and Frederick attended a meeting with Piliero and Goldstein at PGKM's offices. During the course of that meeting, Piliero reiterated that PGKM would need to vacate the premises and that it intended to engage a broker to find a potential further subtenant, but that New Millennium, the prime landlord for which Michaels and Frederick and their employer, Colliers, acted as exclusive agent, might prefer to recapture the space and re-let it at what Piliero understood was the then-prevailing market rent of approximately $80 per square foot, rather than the approximately $45 per square foot that PGKM was then paying for the space.  Michaels and Frederick expressed the opinion that the actual fair market value rent was actually closer to $90 per square foot or higher. Nonetheless, Michaels and Fredericks both indicated that New Millennium would in all likelihood have no interest in recapturing the space because, they said, New Millennium's management responsible for the building in which the subject premises were located had already completed its budget for calendar year 2007 and would not want to go through the trouble of re-calculating the budget-- which would be necessary in the event of a new lease--even if it meant that a substantially greater rent could be collected. The only explanation Michaels and Frederick offered when Piliero and Goldstein expressed their skepticism about this assertion was to point out that New Millennium is controlled by an Italian company, and it is hard to understand how "crazy Italians" think. Michaels and Frederick also indicated that New Millennium would likely be unwilling to

pay a substantial brokerage fee in 2007, but might be willing to do so in 2008 because the 2008 budget had not yet been prepared.

13.    Piliero and Goldstein emphasized repeatedly to Michaels and Frederick that it was critical for PGKM to vacate the premises considerably earlier than year-end 2007 and, for that reason, they intended to promptly engage a real estate broker to find a subtenant. Michaels and Frederick immediately expressed the view that no broker would be able to find a subtenant for such a relatively short-term lease (it was scheduled to expire approximately 18 months later, at the end of December 2008), and that if PGKM intended to engage a broker, it should engage Michaels and Frederick themselves. They did not specify whether they would be acting on behalf of Colliers or New Millennium or simply on their own in a "free-lance" capacity. Michaels and Frederick represented that their position as exclusive agents for, and with direct and access to, New Millennium, placed them at a unique position and provided a material advantage in assisting PGKM to sublease the premises, and that PGKM should engage them for that purpose. Piliero and Goldstein did not know at the time that Michaels and Frederick not only had direct access to New Millennium, but also had the ability and wherewithall to interfere with, and ultimately block, PGKM's access to New Millennium.

14.    Michaels and Frederick also indicated at that meeting that they were currently in discussions with other tenants in the building who might be interested in vacating the premises they were then occupying and, if they did so, they would in all likelihood be interested in taking over the premises occupied by PGKM. Michaels and Frederick indicated that, rather than paying a real estate commission to some other brokerage firm that did not have the inside track that they enjoyed, it would make far more sense for PGKM to engage Michaels and Frederick. At that point, Piliero asked for clarification as to whether Michaels and Frederick were already slated to

- 14 -

receive a commission from the other tenants in the building with the respect to their move. Michaels and Frederick confirmed that if they could do a deal, they would earn not just a single commission but a double commission for representing the new tenant that would take over the space of the existing tenant and for representing the tenant that would take over the PGKM space. They also indicated that they would expect a commission from PGKM for putting that tenant in the PGKM space. Piliero expressed amazement that Michaels and Frederick would expect to receive another commission (from PGKM) in connection with this same transaction, when it would be representing the relocating substitute tenant and not PGKM. Frederick denied that such a commission structure was in any way overreaching for him and Michaels to expect to be compensated by both sides to the same transaction, and they reiterated that PGKM's interests would be best served by engaging them as brokers.

15.    After that meeting concluded, Piliero contacted Intesa and confirmed that Intesa would consent to a Further Sublease if PGKM could present a credit-worthy successor tenant. Intesa indicated that it would give such consent, but would prefer if New Millennium simply recaptured the space and took advantage of the fact that it could double its rental income. Piliero reported this conversation to Michaels.

16.    Shortly thereafter, Piliero learned that a law firm located in the Wall Street area might be interested in a relatively short-term lease (through December 2008, which coincided with the end of the PGKM Sublease) at a midtown location to accommodate its needs in connection with a major pending litigation. Negotiations ensued, and PGKM and this law firm quickly came to final terms that would have enabled the law firm to take over occupancy of the subject premises by August 31, 2007.

- 15 -

17.     Piliero immediately reported this development to Michaels and to Intesa. Both asked for financial information about the proposed further subtenant, and both confirmed within a few days that it had been received and was quite acceptable. This occurred in or about late July or early August 2007.

18.     At about the same time, Intesa again expressed its preference that New Millennium simply recapture the space and enter into a direct lease, thereby eliminating Intesa (and PGKM) from the middle of the transaction. Piliero passed this on to Michaels, who said he would pass it on to New Millennium.

19.     At some point in August, Michaels reported that New Millennium and Intesa had engaged in direct conversations about having New Millennium enter into a direct lease with the law firm identified by PGKM as having an interest in occupying the subject premises on the terms Piliero had described to Michaels, and that New Millennium was ready to do that. Michaels stated that New Millennium's representatives had expressed the view that Intesa should have shown more gratitude for New Millennium's willingness to do so. When Piliero asked Michaels whether he had communicated that to Intesa, he said it would be inappropriate for him to have direct communications with Intesa. That made absolutely no sense since Michaels was the exclusive agent for New Millennium and certainly had on many occasions dealt directly with representatives of its tenant Intesa. But it was clear that Michaels had no interest in having this transaction go forward because he would earn no commission, or a far lower commission than he had hoped for.  Piliero promptly passed on the request to Intesa that it express some gratitude to New Millennium.  The Intesa representative with whom Piliero spoke, Anthony Cardinale, responded that that made absolutely no sense. Piliero reported that conversation to Michaels.

- 16 -

20.     Piliero thereafter telephoned Michaels on multiple occasions in an effort to find out whether the arrangement with the new tenant would be a direct lease from New Millennium or a Further Sublease from PGKM.  Intesa had already indicated that it would follow either approach, but it preferred to have New Millennium enter into a direct lease with the new tenant. Michaels had earlier reported that New Millennium would consent to a further sublease, and that New Millennium would also be willing to enter into a direct lease with the proposed new tenant, but Michaels professed not to know which approach would ultimately be used.  Intesa likewise continued to profess that it did not know how the transaction would ultimately be structured. The one thing that was crystal clear, however, was that the proposed new tenant was acceptable to both New Millennium and Intesa and was fully prepared to occupy the space. Piliero and Goldstein reasonably relied on the representations made by Michaels and Frederick described above.

21.     At no time did Michaels, Frederick or Intesa suggest that PGKM should submit a proposed Further Sublease.  PGKM would have been ready, willing and able to do so because it already had a Further Sublease _fully_ _executed_ by the proposed new tenant.  PGKM had not yet executed and returned it to the prospective tenant or submitted it to Intesa or New Millennium because Intesa had repeatedly expressed its preference that New Millennium enter into a direct lease with the new tenant and Michaels had indicated that New Millennium was willing to do so.

22.     Throughout August and into the early part of September, Piliero made no fewer than 5 attempts--several times through Michaels, and also through Intesa and others--to speak directly with the representative of New Millennium.   Although the New Millennium representative was based in Italy, there were at least two occasions during this time frame when he was in New York, and in fact he was even in the building where the subject premises are

- 17 -

located. When Piliero learned of these visits, he asked Michaels to arrange a meeting, but Michaels refused to do so. Michaels also refused to provide Piliero with contact information for the New Millennium representative, and Piliero's own efforts to contact him were unsuccessful.

23.     August 31 was the date on which the new law firm tenant had intended to take occupancy. When that date passed with no information from Michaels as to which of the two structures the transaction would take, it became clear to Piliero and Goldstein that Michaels and/or Frederick must be interfering with or otherwise blocking any transaction until PGKM agreed to pay a commission to them with respect to the lease transaction with respect to which they had done absolutely nothing. For that reason, in or about the second week of September, Piliero called Michaels and told him that PGKM would pay a commission. Michaels said OK.

24.     Shortly thereafter (and before Michaels sent PGKM a brokerage agreement), Piliero received a telephone call from the law firm that had planned to take occupancy of the premises on August 31, indicating that it no longer wished to do so because of the delay in connection with their proposed occupancy. Piliero immediately informed Michaels of that fact, and expressed surprise that Michaels had not facilitated the transaction since he would have been paid the commission he had demanded from PGKM. Michaels said that it really would not have been that much money for him personally.

25.     PGKM immediately undertook to find a substitute tenant, but was unable to do so. It vacated the premises, paid all outstanding amounts due, and irrevocably turned over possession to Intesa on November 30, 2007.

26.     The only reason that the subject premises were vacant for one month (December 2007) and in fact, not re-let months earlier, and the only reason Intesa needed to pay a brokerage commission to re-let the premises after PGKM vacated it on November 30, 2007 is because of

the conduct undertaken and engaged in by Intesa and by Third-Party Defendants as described above.

27.    In the event the Guarantors are found to have any liability to Intesa on its claim in this action, which Guarantors deny, third-part defendants New Millennium, Colliers, Michaels and Frederick should be liable jointly and severally liable based on, among other things, their tortious and deceptive conduct and business practices and their tortious interference with the Guarantee.

**WHEREFORE,** Defendants and Third-Party Plaintiffs Piliero and Goldstein demand judgment as follows:

(a)    dismissing the complaint asserted against them by Intesa; or in the alternative,

(b)    entering judgment against the third-party defendants, jointly and severally, for all amounts as to which that the Guarantors may be found liable to Intesa; and

(c)    requiring Intesa or the third-party defendants, as the case may be, to reimburse the Guarantors for all costs and expenses, including reasonable attorneys' fees incurred in connection with this action.

Dated:  New York, New York
        May 5, 2008

RICHARDS KIBBE & ORBE LLP

By: _____
    Craig A. Newman

    One World Financial Center
    New York, New York 10281-1003
    Telephone: (212) 530-1924

    *Attorneys for Defendants and Third-Party*
    *Plaintiffs Robert D. Piliero and Edward J.*
    *Goldstein*

- 19 -

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38, Fed. R. Civ. P., Defendants and Third-Party Plaintiffs Robert D. Piliero and Edward J. Goldstein demand trial by jury of all matters.

Dated:  New York, New York
   May 5, 2008

         RICHARDS KIBBE & ORBE LLP

       By: _____
          Craig A. Newman
          One World Financial Center
          New York, New York 10281-1003
          Telephone: (212) 530-1924

         *Attorneys for Defendants and Third-Party Plaintiffs Robert D. Piliero and Edward J. Goldstein*

## AGREEMENT AND GUARANTEE

### KNOW ALL MEN BY THESE PRESENTS THAT:

**WHEREAS:**

1.      Banca Intesa S.p.A. ("Landlord"), having its New York Branch office at One William Street, New York, New York 10004, has been requested by Piliero, Goldstein, Kaiser & Mitchell LLP ("Tenant"), a New York registered limited liability partnership, having an address at 292 Madison Avenue, New York, New York, to enter into a proposed Sublease ("Sublease"), whereby Landlord would let and demise unto Tenant, and Tenant would hire and rent from Landlord, the 36th floor and a portion of the 35th floor, as more particularly described and set forth in the Sublease ("Demised Premises"), in the building known as 10 East 53rd Street, New York, New York, which Sublease is hereby incorporated in this instrument by reference; and

2.      The undersigned, Robert D. Piliero, an individual having a home address at 9 Polly Park Road, Rye, New York 10580, with a Social Security number 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, Edward J. Goldstein, an individual having a home address at 1 Bluewater Hill, Westport, Connecticut 06880, with a Social Security number 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, Laurence J. Kaiser, an individual having a home address at 133 West 28th Street, Apartment 6C, New York, New York 10001, with a Social Security number 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, and John Dermott Mitchell, an individual having a home address at 4 West Bank Road, Rye, New York 10580, with a Social Security number 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, are each partners of Tenant (collectively, jointly and severally, the "Guarantors"); and

3.      Guarantors acknowledge that Landlord would not enter into the Sublease unless this Agreement and Guarantee accompanied the execution and delivery of the Sublease.

**NOW, THEREFORE**, in consideration of the execution and delivery of the Sublease and of other good and valuable consideration, the receipt and sufficiency whereof are hereby acknowledged by Guarantors:

**FIRST:** The undersigned Guarantors do hereby jointly and severally:

A.      Guarantee to Landlord the full and prompt payment of the rent and all other sums and charges payable by Tenant under

{00002843.DOC}

A.    Guarantee to Landlord the full and prompt payment of the rent and all other sums and charges payable by Tenant under the Sublease, and the full and timely performance and observance of all covenants, terms, conditions, obligations and agreements under the Sublease therein provided to be performed and observed by Tenant, its successors and assigns; and Guarantors covenant to and agree with Landlord that if Tenant, or its successors or assigns, shall default at any time during the term demised in the Sublease in the payment of rent, additional rent, or other charges payable by Tenant under the Sublease, or in the observance or performance of any of the terms, covenants or conditions of the Sublease on Tenant's part to be observed or performed, beyond the applicable grace period provided in the Sublease in the payment of rent, additional rent, or other charges payable by Tenant under the Sublease, or in the observance or performance of any of the terms, covenants or conditions of the Lease on Tenant's part to be observed or performed, beyond the applicable grace period provided in the Sublease for the curing of such default, if any, then Guarantors will, without notice or demand, forthwith well and truly observe and perform said terms, covenants and conditions and pay to Landlord the rent, additional rent and other charges payable by Tenant under the Sublease, or any arrears thereof that may remain due to Landlord, its successors and assigns, and all damages, costs and expenses, including, but not limited to, any damages payable pursuant to the Sublease that may arise in consequence of Tenant's insolvency or such default in the observance or performance of any said terms, covenants or conditions;

B.    Covenant to and agree with Landlord that any action, suit or proceeding brought against Guarantors to collect the amount of any deficiency under the Sublease for any month or months shall not prejudice in any way the rights of Landlord to collect any such deficiency for any subsequent month or months in any similar suit or proceeding;

C.    Covenant to and agree with Landlord that Guarantors may, at Landlord's option, without prior notice or demand, be joined in any action or proceeding commenced by Landlord against Tenant in connection with or based upon the Sublease or any term, covenant or condition thereof, that recovery may be had against Guarantors in such action or proceeding or in any independent action or proceeding against Guarantors without Landlord, its successors or assigns, first asserting, prosecuting, or exhausting any remedy or claim against Tenant, their successors or assigns, or against any security of Tenant

{00002843.DOC}

2

held by Landlord under the Sublease, and that Guarantors will be conclusively bound in any jurisdiction by the judgment in any such action by Landlord against Tenant as if Guarantors were a party to such action even though Guarantors are not joined as a party in such action;

D.    Covenant to and agree with Landlord that this Agreement and Guarantee shall be a continuing guarantee and shall remain in full force and effect notwithstanding any modifications or amendments of the Sublease to the extent (but only to the extent) the amendments increase the then Tenant's obligations under the Sublease, any releases or discharges of Tenant (other than full release and complete discharge of all of Tenant's obligations under the Sublease), any extension of time that may be granted by Landlord to Tenant, any subletting or assignment, any changed or different use of the Demise Premises, any other dealings or matters occurring between Landlord from other persons or entities, the releasing by Landlord of any other guarantor, or Landlord's failure to perfect or release any security interest provided in the Sublease or any Landlord's lien provided by law, to all of which foregoing matters Guarantors hereby consent in advance;

E.    Covenant to indemnify and save Landlord harmless of and from all loss, cost, liability, expense or damage, including, but not limited to, counsel fees and disbursements which may arise by reason of Tenant's default under the Sublease, or Tenant's insolvency, or Guarantor's default hereunder;

F.    Covenant to and agree with Landlord (i) that the validity of this Agreement and Guarantee shall in no way be terminated, modified, affected, diminished or impaired by reason of any action which Landlord may take or fail to take against Tenant, or by reason of any waiver of, or failure to enforce, any of the rights or remedies reserved of Landlord under the Sublease, or otherwise, or by relief of Tenant from any of Tenant's obligations under the Sublease, or by (a) the release or discharge of Tenant in any creditor's proceedings, receivership, bankruptcy or other proceedings, (b) the impairment, limitation or modification of the liability of Tenant or the estate of Tenant in bankruptcy, or of any remedy for the enforcement of Tenant's said liability under the Sublease resulting from the operation of any present or future provision of the Federal Bankruptcy Code of 1986, as amended ("Bankruptcy Code"), or other statute, or from the decision of any court, or (c) the rejection or disaffirmance of the Sublease

{00002843.DOC}

3

in any such proceedings; (ii) that the failure or refusal of Landlord to re-let the Demised Premises or any part thereof in the event that Landlord shall obtain possession thereof after Tenant's insolvency or default shall not release or affect Guarantors' liability hereunder, nor shall Landlord be liable in any way whatsoever for failure to re-let the Demised Premises or any part thereof, or, in the event that the Demised Premises are re-let, for failure to collect rent under any such re-letting; and (iii) that Landlord, at Landlord's option, may make such alterations, repairs, replacements or decorations in the Demised Premises or any part thereof, as Landlord, in Landlord's sole judgment, considers advisable and necessary for the purpose of re-letting the Demised Premises, and the making of such alterations or decorations shall not operate or be construed to release Guarantors from their liability hereunder;

G.    Waive notice of the acceptance of this Agreement and Guarantee and of any and all defaults by Tenant in the payment of rent, additional rent, or other charges, and of any and all defaults by Tenant in the performance of any of the terms, covenants or conditions of the Sublease on Tenant's part to be observed or performed, and of any and all notices or demands which may be given by Landlord to Tenant, whether or not required to be given to Tenant under the terms of the Sublease;

H.    Waive trial by jury of any and all issues arising in any action or proceeding between the parties, upon, under or in connection with this Agreement and Guarantee or any and all negotiations and agreements in connection therewith;

I.    Acknowledge that this Agreement and Guarantee is an absolute and unconditional guarantee of payment and of performance, and not of collection in respect to any obligations which may accrue to Landlord from Tenant under the provisions of the Sublease, and that this Agreement and Guarantee shall be enforceable against Guarantors without the necessity of any suit or proceedings on the part of Landlord of any kind or nature whatsoever, against Tenant, its successors and assigns, and without the necessity of any notice of nonpayment, nonperformance or nonobservance or any notice of acceptance of this Agreement and Guarantee or of any other notice or demand to which Guarantors might otherwise be entitled, all of which Guarantors hereby expressly waive in advance;

J.    Acknowledge that Landlord may make demand and enforce this Guarantee before drawing on any letter of credit or other security Tenant has furnished Landlord and that Guarantors'

(00002843.DOC)                                   4

obligations under this Agreement and Guarantee are not reduced, secured or affected by the existence of any such security;

K.    Covenant to and agree with Landlord that the validity of this Agreement and Guarantee shall in no way be terminated, affected or otherwise impaired by reason of any assignment or transfer of all or any part of Tenant's interest in the Sublease;

L.    Covenant to and agree with Landlord that in the event of termination of the Sublease by reason of the occurrence of any of the events of default of the Sublease, or in the event of the disaffirmance or rejection of the Sublease in any proceeding of the type referred to in Article 25 of the Overlease as incorporated into the Sublease, or in any similar proceeding, Guarantors shall, upon written request of Landlord given by certified mail, return receipt requested within thirty (30) days next following any such termination, disaffirmance or rejection (and actual notice hereof to Landlord in the event of a disaffirmance or rejection or in the event of a termination other than by act of Landlord) pay to Landlord all rent, additional rent and other charges due and owing from Tenant to Landlord under the Lease, to and including earlier of (a) the date of its original expiration notwithstanding its disaffirmance or rejection or (b) until such time as all the conditions of paragraph Fourth have been met;

M.    Covenant to and agree with Landlord that, until all the covenants and conditions in the Sublease on Tenant's part to be performed and observed are fully performed and observed, Guarantors (i) waive any right of subrogation against Tenant by reason of any payments or acts of performance by Guarantors herewith or any right to enforce any remedy which Guarantors may have against Tenant by reason of any such payment or performance, and (ii) subordinates any liability or indebtedness of Tenant now or hereafter held by Guarantors, to the obligations of Tenant to Landlord under the Sublease;

N.    Submit Guarantors to the jurisdiction of the Courts of the State of New York, and irrevocably appoint the Secretary of the State of New York as its agent for the service of process in any action against Guarantors arising out of this Agreement and Guarantee. Pursuant to such service, suit may be brought against Guarantors in New York County, New York. This provision shall not affect any right to serve process upon Guarantors in any other manner permitted by law;

{00002843.DOC}

5

O.    Represent that Guarantors have the legal right and capacity to execute this Agreement and Guarantee and that Guarantors are partners of Tenant, a New York registered limited liability partnership. If this Agreement and Guarantee be held ineffective or unenforceable, Guarantors shall be deemed to be a tenant under the Sublease with the same force and effect as if Guarantors were expressly named as a joint tenant herein with joint and several liability thereunder; and

P.    Covenant to and agree with Landlord that Tenant will not merge or consolidate or sell or otherwise dispose of all or substantially all of its assets unless the surviving entity or transferee of said assets, as the case may be, (i) shall first deliver to Landlord, an acknowledged instrument in recordable form assuming all of the agreements, obligations, covenants and responsibilities of Guarantors hereunder, and (ii) shall, immediately after such merger, consolidation or transfer, have a net worth not less than that of Guarantors immediately prior to such merger, consolidation or transfer.

SECOND: The provisions, covenants and guarantees of this Agreement and Guarantee shall be binding upon Guarantors, their successors and assigns and shall inure to the benefit of Landlord, its successors and assigns, and shall not be deemed waived or modified unless specifically set forth in writing, executed by Landlord, or its successors and assigns and delivered to Guarantors. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms or the singular form of nouns and pronouns shall include the plural and vice versa.

THIRD: The provisions of this Agreement and Guarantee shall be governed by and interpreted in accordance with the internal laws of the State of New York, without giving effect to the principles of conflicts of law.

FOURTH: Notwithstanding anything to the contrary set forth in this Agreement and Guarantee, the obligations of the Guarantors will end as to obligations under the Sublease (but not under this Agreement and Guarantee) accruing after two conditions have been met: (a) the Landlord receives vacant possession of the Demised Premises in the condition they are required to be surrendered under the Sublease; and (b) as a matter of law the claim of the Tenant, its successors or assigns to possession of the Demised Premises has terminated and cannot be revived. Condition (b) will be met if the Tenant has rejected the Sublease under the Bankruptcy Code and that rejection has been approved by the Bankruptcy Court and is not

{00002843.DOC}

6

subject to appeal provided that this test will be deemed met if Landlord opposes the rejection. While obligations under the Sublease will thereupon so cease to accrue for the account of the Guarantors, their obligations under this Agreement and Guarantee will continue until all obligations arising hereunder have been paid or performed.

Notwithstanding anything to the contrary set forth in this Agreement and Guarantee, the Guarantors are not responsible for the consequential damage if a subtenant of Tenant holds over in the Demised Premises without Landlord's consent and so deprives Landlord of the opportunity to use or lease the Demised Premises but Guarantors will be responsible to procure the eviction of the holdover tenant as provided in the Sublease.

**FIFTH:** Paragraph Fourth addresses the possibility that the obligations which Guarantors guarantee under the Sublease will cease to accrue. When (a) the conditions of Paragraph Fourth have been met, and (b) Landlord has received the full amount then due under the Tenant's Letter of Credit (as defined in the Sublease) the maximum amount of the Guarantors' obligation hereunder will be reduced to $119,718. If Tenant pays and performs all of its obligations under the Sublease accruing through the first anniversary of the Commencement Date (as defined in the Sublease) and increases the aggregate amount of the Letter of Credit to $159,626.68 prior to such first anniversary, the maximum amount of Guarantors' obligation hereunder will be reduced to $79,813.34. If Tenant pays and performs all of its obligations through the second anniversary of the Commencement Date and the Letter of Credit remains in full force and effect as increased, Guarantors' obligations will be reduced to a maximum amount of $39,906.67. If the Tenant pays and performs all of its obligations under the Sublease through the third anniversary of the Sublease and the Letter of Credit remains in full force and effect as increased, the Guarantors' obligations after all the conditions of paragraph Fourth have been met will be reduced to zero.

This Agreement and Guarantee does not modify the terms of the Sublease and nothing herein contained shall relieve Tenant from any liability thereunder in accordance with the terms of the Sublease.

**IN WITNESS WHEREOF**, the undersigned Guarantors have signed and sealed this Agreement and Guarantee as of this 20th day of March, 2003.

(00002843.DOC)

STATE OF NEW YORK  )
                   )ss.:
COUNTY OF NEW YORK )

On the 20th day of March in the year 2003, before me, the undersigned, a Notary Public in and for said State, personally appeared Robert D. Piliero, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed this instrument.

_____
Notary Public

HOWARD IVES
Notary Public, State of New York
No. 4642005
Qualified in Westchester County
Commission Expires Aug. 31,
2006

STATE OF NEW YORK  )
                   )ss.:
COUNTY OF NEW YORK )

On the 20th day of March in the year 2003, before me, the undersigned, a Notary Public in and for said State, personally appeared Edward J. Goldstein, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed this instrument.

_____
Notary Public

HOWARD IVES
Notary Public, State of New York
No. 4642005
Qualified in Westchester County
Commission Expires Aug. 31,
2006

{00002843.DOC}

9

STATE OF NEW YORK        )
                         ) ss.:
COUNTY OF NEW YORK       )

On the 20th day of March in the year 2003, before me, the undersigned, a Notary Public in and for said State, personally appeared Laurence J. Kaiser, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed this instrument.

Notary Public

HOWARD IVES
Notary Public, State of New York
No. 4642005
Qualified in Westchester County
Commission Expires Aug. 31, 2006

STATE OF NEW YORK        )
                         ) ss.:
COUNTY OF NEW YORK       )

On the 20th day of March in the year 2003, before me, the undersigned, a Notary Public in and for said State, personally appeared John Dermott Mitchell, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed this instrument.

Notary Public

HOWARD IVES
Notary Public, State of New York
No. 4642005
Qualified in Westchester County
Commission Expires Aug. 31, 2006

{00002843.DOC}

10

**EXHIBIT B**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE ST

------------------------------------------------

INTESA SANPAOLO S.p.A.,

08 CV 2223

            Plaintiff,          :

  - against -              :    **COMPLAINT**

ROBERT D. PILIERO, EDWARD J.     :
GOLDSTEIN, and JOHN DERMOTT
MITCHELL,                :

           Defendants.    :

------------------------------------------------x

Case 1:08-cv-02223-LLS    Document 1    Filed 03/06/2008    Page 1 of 5

Plaintiff Intesa Sanpaolo S.p.A. ("Plaintiff"), by its attorneys, Gilmartin,

Poster & Shafto LLP, for its complaint herein, avers as follows:

1.    Plaintiff was at all relevant times, and still is, a corporation

organized and existing under and by virtue of the laws of the Republic of

Italy and is licensed to conduct a banking business in the State of New York

through a branch located at One William Street, New York, New York 10004.

Plaintiff maintains its principal place of business in Milan, Italy.

2.    Plaintiff was formerly known as Banca Intesa S.p.A. ("Intesa"),

which was the successor by merger to Cariplo-Cassa Di Risparmio Delle

Provincie Lombarde S.p.A. ("Cariplo").

3.    Defendants Robert D. Piliero, Edward J. Goldstein, and John

Dermott Mitchell (collectively, "Defendants") are each individuals who at all

relevant times were, and still are, citizens and residents of the State of New

York.

{00019782.DOC}

4.    This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §1332(a) and (c) because the matter in controversy exceeds the sum of $75,000, exclusive of interests and costs, and is between citizens of a state and a citizen of a foreign state.

Case 1:08-cv-02223-LLS     Document 1     Filed 03/06/2008     Page 2 of 5

5.    Venue is proper in this district pursuant to 28 U.S.C. §1391(a).

6.    On or about January 1, 1994, Cariplo's New York Branch, as tenant, entered into a lease ("Lease") with New Millennium Estates Ltd., as landlord, for premises located on the 35th and 36th floors in the building known as 10 East 53rd Street, New York, New York ("Premises"). The term of the Lease extended to December 31, 2008.

7.    On or about March 20, 2003, Intesa, as sublandlord and successor-in-interest to Cariplo, entered into a sublease with Piliero, Goldstein, Kaiser & Mitchell, LLP, as subtenant ("Subtenant"), for the Premises for a term commencing on April 1, 2003 and ending December 29, 2008.  That sublease, as subsequently amended by a First Amendment to Sublease, dated January 22, 2004, is hereinafter referred to as the "Sublease."

8.    The Sublease incorporated all the relevant and material terms of the Lease and applied them to the relationship between Intesa and the Subtenant.

9.    On or about March 20, 2003, each of the Defendants, who were individual partners in the Subtenant, signed an Agreement and Guarantee ("Guarantee") pursuant to which they, jointly and severally, absolutely and

unconditionally guaranteed the payment and performance of Subtenant's obligations under the Sublease.

10.    In connection with the First Amendment to Sublease, on or about January 15, 2004, each of the Defendants confirmed in writing that their Guarantee applied with equal force and effect to the Sublease as amended by the First Amendment to Sublease.

Case 1:08-cv-02223-LLS    Document 1    Filed 03/06/2008    Page 3 of 5

11.    Subtenant defaulted under the Sublease by not paying the rent, operating expense and tax escalation for October and November 2007 in the aggregate amount of $126,455.36, plus electricity charges aggregating $8,890.86, for a total arrears of $135,346.22 ("Arrears").

12.    Subtenant purported to vacate the Premises by November 30, 2007 (although the Premises were not left broom clean and certain equipment had not yet been removed as the Sublease required).

13.    In addition to the Arrears, Subtenant is liable to Plaintiff, inter alia, for the rent for the balance of the term of the Sublease (i.e., until December 31, 2008) less a credit for the proceeds received by Plaintiff from re-letting the Premises, net of the expenses incurred by Plaintiff in re-letting ("Post-Vacation Damages").

14.    Plaintiff has re-let the Premises. After crediting the net proceeds of re-letting, Subtenant still owes Plaintiff Post-Vacation Damages that exceed the aggregate of rent heretofore paid under the Sublease and the amount of the security that was held by Plaintiff.

{00019782.DOC}                                3

15.    As was its right under the terms of the Lease that were expressly incorporated into the Sublease, Plaintiff elected to apply Subtenant's rent payments and security to reduce the Post-Vacation Damages owed to it by Subtenant.

16.    The Arrears remain unpaid after application by Plaintiff of the security.

Case 1:08-cv-02223-LLS    Document 1    Filed 03/06/2008    Page 4 of 5

17.    Under the terms of the Guarantee, the joint and several liability of each of the Defendants ends as to obligations accruing under the Sublease once the Subtenant gives Plaintiff vacant possession of the Premises in accordance with the terms of the Sublease, but Defendants remain jointly and severally liable for the Arrears, plus $1,200 in additional cleaning costs incurred because the Premises were not broom clean, as required by the Sublease.

18.    The Guarantee provides that Plaintiff "may make demand and enforce this Guarantee before drawing on any letter of credit or other security [Subtenant] has furnished [Plaintiff] and that Guarantors' obligations under this Agreement and Guarantee are not reduced, secured or affected by the existence of any such security. . ."

19.    Under the terms of the Guarantee, Defendants are also jointly and severally liable for Plaintiff's expenses and damages, including but not limited to counsel fees and disbursements, arising from any default by Subtenant under the Sublease or a default under the Guarantee.

20.    Despite repeated demands by Plaintiff, none of the Defendants have paid any portion of the Arrears.

21.    Plaintiff has duly performed all of its obligations under the Sublease and Guarantee.

Case 1:08-cv-02223-LLS    Document 1    Filed 03/06/2008    Page 5 of 5

22.    By reason of the foregoing, each of the Defendants is in default under the Guarantee and is liable to Plaintiff in the amount of $136,546.22, plus interest and collection expenses, including counsel fees.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, in the amount of $136,546.22, plus interest, and awarding Plaintiff costs and disbursements of suit, counsel fees, and such other and further relief as the Court deems just and proper.

Dated:  New York, New York
         March 5, 2008

                                        GILMARTIN, POSTER & SHAFTO LLP

                                        By:  _____
                                             Michael C. Lambert (ML-3408)
                                             845 Third Avenue
                                             New York, New York  10022
                                             (212) 425-3220
                                             Attorneys for Plaintiff Intesa Sanpaolo S.p.A.

{00019782.DOC}                          5

**EXHIBIT C**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

INTESA SANPAOLO S.p.A.,                                08 Cv. 2223 (LLS)

                                    Plaintiff,

            -against-

ROBERT D. PILIERO, EDWARD J.                ANSWER AND CROSS CLAIM
GOLDSTEIN, and JOHN DERMOTT
MITCHELL,

                                    Defendants.

ROBERT D. PILIERO and EDWARD J.
GOLDSTEIN,

                        Third-Party Plaintiffs,

            -against-

NEW MILLENNIUM ESTATES LTD,
COLLIERS ABR, RICHARD MICHAELS and
JAMES FREDERICK,

                        Third-Party Defendants.

        Defendant John Dermott Mitchell ("Mitchell") through his attorneys Nixon Peabody

hereby asserts as his Answer to the Complaint of plaintiff Intesa Sanpaolo S.p.A. ("Plaintiff" or

Intesa") as follows:

        1.      Denies knowledge or information sufficient to form a belief with respect to the

allegations set forth in Paragraph 1 of the Complaint.

        2.      Denies knowledge or information sufficient to form a belief with respect to the

allegations set forth in Paragraph 2 of the Complaint.

        3.      Denies knowledge or information sufficient to form a belief as to the allegations

set forth in Paragraph 3 of the Complaint, except admits that Mitchell was at all relevant times a

citizen and resident of the State of New York.

4.    Denies the allegations set forth in Paragraph 4 of the Complaint on the ground that they call for legal conclusions as to which no response is required.

5.    Denies the allegation set forth in Paragraph 5 of the Complaint on the ground that it calls for a legal conclusion as to which no response is required.

6.    Denies knowledge or information sufficient to form a belief with respect to the allegations set forth in Paragraph 6 of the Complaint.

7.    Admits the allegations set forth in Paragraph 7 of the Complaint, except denies knowledge or information sufficient to form a belief as to whether Intesa is the successor-in-interest to Cariplo-Cassa di Risparmio Delle Provincie Lombarde S.p.A.

8.    Denies the allegations set forth in Paragraph 8 of the Complaint, and refers to the sublease documents for a complete and accurate statement of their terms.

9.    Denies the allegations set forth in Paragraph 9 of the Complaint, except: admits that Mitchell was a partner in a limited liability partnership named Piliero Goldstein Kaiser and Mitchell, LLP ("PGKM"); admits that he signed an Agreement and Guarantee dated March 20, 2003 (the "Guarantee"), and refers to that document for a complete and accurate statement of its terms; and affirmatively alleges that the Guarantee was a so-called "Good Guy" Guarantee pursuant to which Intesa had specifically agreed, in the paragraph labeled "Fourth," that "the obligations of the Guarantors will end after [Intesa] receives vacant possession of the Demised Premises in the condition they are required to be surrendered under the Sublease; and" PGKM's right to possession of the premises "has terminated and cannot be revived;" and further affirmatively alleges that the Guarantee also specifically provided, in the paragraph labeled "Fifth," that the Guarantors' obligation under the Guarantee would be "reduced to zero" as of March 19, 2006 as long as PGKM paid and performed all its obligations under the Sublease

2

through that date and as long as the conditions of the paragraph labeled "Fourth" were satisfied; and further affirmatively alleges upon information and belief that the conditions precedent to full exoneration and release of the Guarantors under the terms of the Guarantee have occurred.

10.    Denies the allegations set forth in Paragraph 10 of the Complaint, as it pertains to Mitchell; denies knowledge and information sufficient to form a belief as to any of the other defendants and refers to the documents to which reference is made for a complete and accurate statement of their terms.

11.    Upon information and belief denies the allegations set forth in Paragraph 11 of the Complaint, and affirmatively alleges upon information and belief that all amounts owed to Intesa were paid to it in full on or before November 30, 2007.

12.    Upon information and belief denies the allegations set forth in Paragraph 12 of the Complaint, except admits that the subject premises were vacated on or before November 30, 2007, and affirmatively alleges that the condition of the subject premises was in material compliance with the relevant provisions of all these documents.

13.    Denies the allegations set forth in Paragraph 13 of the Complaint.

14.    Upon information and belief denies the allegations set forth in Paragraph 14 of the Complaint, except admits upon information and belief that Intesa re-let the premises effective January 1, 2008, only one month after said premises were vacated.

15.    Upon information and belief denies the allegations set forth in Paragraph 15 of the Complaint, and upon information and belief affirmatively alleges the following:

(a)    as of November 30, 2007, the total amount then claimed by Intesa to be due with respect to the subject premises was $133,576.15;

(b)  by letter dated November 20, 2007, PGKM advised counsel for Intesa that: (i) PGKM intended to vacate the subject premises on or before November 30, 2007; (ii) PGKM understood that the total amount claimed by Intesa to be due from PGKM under the sublease was for the months of October and November 2007, in the aggregate amount of $133,576.15; and (iii) PGKM intended to pay that amount in full on or before November 30, 2007 by providing Intesa with a check in the amount of $13,858.15 and written authorization for Intesa to draw down on the $119,718 letter of credit that had been posted as collateral security under the Sublease;

(c)  Intesa did not advise PGKM of any dispute with respect to the amount owed (in fact, the amount was the same amount as reflected in Intesa's outstanding invoices), nor did it advise PGKM that it intended to allocate the payments to be made by PGKM in any manner different from that specified in PGKM's November 20, 2007 letter;

(d)  by letter dated November 30, 2007, and delivered by hand to Intesa's counsel that same day, PGKM did in fact authorize Intesa to draw down on the letter of credit in the amount of $119,718, and did in fact enclose a check in the amount of $13,858.15, which together aggregated $133,576.15 for the months of October and November 2007, which was the total amount that was then claimed by Intesa to be due from PGKM with respect to the subject premises;

(e)  on or before November 30, 2007, PGKM delivered vacant possession of the premises to Intesa in the condition required under the Sublease;

(f)  almost immediately after receiving PGKM's written authorization, Intesa did in fact draw down on the letter of credit in the amount of $119,718 by falsely representing to the issuing bank that that sum was in fact due and owing.

4

16.    Upon information and belief denies the allegations set forth in Paragraph 16 of the Complaint.

17.    Denies the allegations set forth in Paragraph 17 of the Complaint and refers to the Guarantee for a complete and accurate statement of its terms.

18.    Denies the allegations set forth in Paragraph 18 of the Complaint, and refers to the Guarantee for a complete and accurate statement of its terms.

19.    Denies the allegations set forth in Paragraph 19 of the Complaint, and refers to the Guarantee for a complete and accurate statement of its terms.

20.    Denies the allegations set forth in Paragraph 20 of the Complaint as it pertains to Mitchell and upon information and belief admits that Intesa, through its counsel, has made repeated demands on Defendants Piliero and Goldstein for the payment of amounts to which Intesa has no entitlement, and that Defendants Piliero and Goldstein have refused to pay such amounts.

21.    Upon information and belief denies the allegations set forth in Paragraph 21 of the Complaint, and affirmatively alleges that the conduct of Intesa in the months preceding PGKM's vacating of the premises constituted multiple breaches of the covenant of good faith and fair dealing that is legally implied into the contracts between Intesa and defendants Piliero and Goldstein under the terms of the Guarantee.

22.    Denies the allegations set forth in Paragraph 22 of the Complaint.

## FIRST DEFENSE

23.    The Complaint and each and every claim thereof fails to state a claim upon which relief may be granted against Mitchell.

## SECOND DEFENSE

24.    Mitchell has no liability under the Guarantee.

## THIRD DEFENSE

25.    Intesa has received all amounts to which it is entitled under the Guarantee.

## FOURTH DEFENSE

26.    As a result of the acts, conduct, and omissions of Plaintiff, its agents, and Third-Party Defendants, each and every claim and cause of action presented in the Complaint has been waived.

## FIFTH DEFENSE

27.    As a result of the acts, conduct and omission of Plaintiffs, its agents, and Third-Party Defendants, each and every claim and cause of action presented in the Complaint is barred by the doctrine of estoppel.

## SIXTH DEFENSE

28.    Plaintiff is barred from recovering on each and every claim and cause of action presented in the Complaint by the doctrine of unclean hands.

## SEVENTH DEFENSE

29.    Each and every claim and cause of action of Plaintiff is barred on the grounds that Plaintiff has failed to join one or more indispensable parties.

## EIGHTH DEFENSE

30.    Each and every claim and cause of action of Plaintiff is barred in whole or in part because any harm or damage(s) alleged is not legally attributable to the acts or omissions of Mitchell.

6

### NINTH DEFENSE

31.    Each and every claim and cause of action of Plaintiff is barred in whole or in part because Plaintiff's alleged losses, if any, were caused by Plaintiff's own conduct (or conduct of Plaintiff's agents) and/or misconduct, and/or the supervening and intervening actions of third parties.

### TENTH DEFENSE

32.    Each and every claim and cause of action of Plaintiff is barred in whole or in part by the doctrine of in pari delicto.

### ELEVENTH DEFENSE

33.    Plaintiff's claims are barred by the doctrine of estoppel.

### CROSS CLAIMS FOR CONTRIBUTION AND INDEMNIFICATION

34.    Defendant Mitchell, by way of cross claims against his co-defendants Robert D. Piliero and Edward J. Goldstein and the third party defendants New Millennium Estates Ltd., Colliers ABR, Richard Michaels and James Frederick says:

35.    On information and belief, other parties engaged in culpable conduct which contributed to or caused plaintiff's damages, if any.

36.    Accordingly, if Mitchell is held liable in whole or in part, he is entitled to contribution or indemnification from other parties.

37.    Further, if Mitchell is held liable in whole or in part, he is entitled to indemnification from his former partners pursuant to written agreements and law.

WHEREFORE, Defendant Mitchell demands judgment as follows:

(a)    dismissing the complaint asserted against him by Intesa; or in the alternative,

7

(b)      entering an order requiring contribution and/or indemnification on any and all amounts assessed against Mitchell from his co-defendants or the third party defendants in this action, jointly and severally, and for all amounts as to which Mitchell may be found liable to Intesa; and

(c)      requiring Intesa or the cross claim defendants to reimburse Mitchell for all costs and expenses, including reasonable attorneys' fees incurred in connection with this action.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38, Fed. R. Civ. P., Defendant John Dermott Mitchell demands trial by jury on all issues to triable.

Dated: May 8, 2008

NIXON PEABODY, LLP

BY: _____

Cathy Fleming (CF-2682)
437 Madison Avenue
New York, NY 10022
(212) 940-3000
Attorneys for Defendant John Dermott Mitchell

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

INTESA SANPAOLO S.p.A.,                    08 Cv. 2223 (LLS)

                        Plaintiff,

    -against-

ROBERT D. PILIERO, EDWARD J.              **AFFIDAVIT OF SERVICE**
GOLDSTEIN, and JOHN DERMOTT
MITCHELL,

                        Defendants.

---

STATE OF NEW YORK    )
                     : ss.:
COUNTY OF NEW YORK   )


Ann Poznanski, being duly sworn, deposes and says:

1.      I am over the age of eighteen and am employed by Nixon Peabody LLP,
the attorneys for Defendant John Dermott Mitchell.

2.      On May 8, 2008, a copy of Defendant Mitchell's Answer and Cross Claim
was served by facsimile and regular U.S. Mail upon:

Michael C. Lambert Esq.
Gilmartin, Poster & Shafto
845 Third Avenue, 18th floor
New York, NY 10022
Counsel for Plaintiff

Craig A. Newman
Richards Kibbe & Orbe LLP
One World Financial Center
New York, New York 10281-1003
Counsel for Defendants Piliero and Goldstein


Sworn to before me on this
8th day of May 2008
                                        _____
                                        Ann Poznanski

_____
Notary Public

11011815.1

YANCY FLEETWOOD
Notary Public, State of New York
No. 01-FL6034777
Qualified in New York County
Commission Expires Dec 20, 2009